IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JERRY DOWELL,

        Plaintiff,

                                     3:12-CV-00081-PK

                                     FINDINGS AND

v.                                 RECOMMENDATION

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

_____

PAPAK, Magistrate Judge:

       Plaintiff Jerry L. Dowell filed this action (#2) on January 12, 2012, seeking judicial

review of the Commissioner of Social Security's final decision denying Dowell's application for

disability insurance benefits under Title II and supplemental security income under Title XVI of

the Social Security Act (the "Act") for the period from January 1, 2005, through March 23, 2007.

1 - FINDINGS AND RECOMMENDATION

This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). I have considered all of the parties' briefs and all evidence in the administrative record. For the reasons set forth below, the Commissioner's decision should be REMANDED for further administrative proceedings consistent with this opinion.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140. If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-41; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work

activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141. If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, Subpt. P, App. 1 (the "Listing"), the claimant will conclusively be found disabled. *See id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical, and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, *1.

3 - FINDINGS AND RECOMMENDATION

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. *See* 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142. If the Commissioner meets his burden of demonstrating that there are a significant number of jobs in the national economy within the limitations of the claimant's proven RFC, the claimant is conclusively found not to be disabled. *See id.* A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966(d).

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Dowell was born March 23, 1952. Tr. 209.[2] During Dowell's childhood, his father physically abused Dowell and Dowell's mother, and Dowell was in foster care for between four to eight years. Tr. 215, 282. Dowell was in special education from an early age, and was "passed

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

through" until he stopped attending school sometime between the seventh and eleventh grade. Tr. 102-03, 172, 215, 266, 311.

Dowell is functionally illiterate. Tr. 107, 111, 113, 130, 213, 215, 283, 312, 345-46, 425. Dowell is independent and able to drive, prepare his own meals, do housework, and play solitaire without assistance. Tr. 108-11, 134-35, 266. Dowell has been married twice, and is still married to his second wife, Brenda. Tr. 92. Dowell smokes two packs of cigarettes daily. Tr. 221. Dowell's reported alcohol consumption has increased over time. Dowell reported drinking: "occasionally" in August of 2002, Tr. 209-10; three to four beers per day in October of 2002, Tr. 214; six beers per day in September of 2003 and January of 2005, Tr. 221, 228-30; and somewhere between twelve and twenty-four beers per day between May of 2005 and December of 2007, Tr. 235-38, 268. Dowell has a history of two DUIs and imprisonment for sexual assault. Tr. 214.

In 1993, Dowell worked at Robertson & Svanda Enterprises, Inc., as a warehouse worker and lead person, supervising eight people. Tr. 79, 117-18, 177, 314. In 1994, Dowell worked at Saltzman Corp., but Dowell reported that he was unable to recall the nature of his employment there. Tr. 79, 314. Dowell's most recent full-time employment was from 1994 to 2002 as a warehouse worker at Genco, scanning damaged products and loading and unloading trucks with a forklift. Tr. 76, 79-80, 99, 117-19, 313-16. Dowell's warehouse jobs both involved lifting and carrying boxes and bags weighing 50 pounds or more. Tr. 118-19, 313-16. In 2001, Dowell earned $18,000, the highest salary he had ever received. Tr. 76. Dowell's employment ended the

following year, on April 16, 2002, and he has not had full-time employment since.[3]  Tr. 76, 92-95.

Dowell has offered different reasons why his employment at Genco ended: the company went out of business, Tr. 99, 203; Dowell was fired because he and his wife were discovered "pilfering" food, Tr. 215; and Dowell couldn't lift anything or stand on his feet very long, Tr. 282.  Dowell may also have offered another reason: Dowell reported that he was fired from his "longest job" lasting "8 years" because he got into "an argument with his boss . . . trying to defend four disabled workers[.]" Tr. 281.  Only Dowell's job at Genco fits that description.  Tr. 79-80.  However, Dowell also reported that he was working at the time as a "foreman forklift driver", and that does not accurately describe Dowell's employment at Genco  Tr. 281. Moreover, Dowell proceeded to describe a different position in a manner that only matched Dowell's job at Genco, stating that his "last job was for 6 years in another warehouse[.]" Tr. 79-80, 282.

Dowell reported a childhood injury to his left shoulder that caused rib fractures and scapular abnormality, Tr. 228, and a workplace injury to his back in approximately 1981 that caused a crushed vertebra and discectomy surgery, Tr. 209, 228.  There are no medical reports in the administrative record from the time of these injuries.

Dowell first applied for disability benefits in 2002.[4]  *See Dowell v. Commissioner Social*

---

[3]  After April 16, 2002, Dowell was employed for three days in June and July, 2002, by Labor Ready doing "various physical jobs." Tr. 80, 93-94, 215.  Dowell reported he discontinued his employment at Labor Ready because the physical work was hard on his back, Tr. 93-94, and was causing back and shoulder pain, Tr. 214-15.

[4]  Dowell's 2002 application for benefits is neither part of the administrative record nor at issue in these proceedings.

7 - FINDINGS AND RECOMMENDATION

*Security Administration, accessible on CM/ECF as* 6:05-CV-00180-AA, ECF No. 13-2, at 1,

Nov. 8, 2005. The earliest medical report appearing in the administrative record dates from

August 28, 2002, when Dowell saw Jim Tarro, M.D., for Dowell's complaints of: pain in the

right shoulder that Dowell reported had been increasing for several years; chronic low back pain

associated with Dowell's reported decades-old workplace injury; and "a rib bone growing up into

his right shoulder", without an MRI or other diagnostic history "due to finances." Tr. 209.

Dowell reported that he "[did] not do anything that involve[d] any lifting." Tr. 210. Dr. Tarro

did not observe any objective limitations, but encouraged Dowell to get further medical

evaluation. Tr. 211-12.

On October 16, 2002, Luke Patrick, Ph.D., assessed Dowell's intellectual status. Tr. 178,

213. Dowell reported that his main problem was back and right shoulder pain, Tr. 213, he could

not do house chores involving heavy lifting and had to stay in the truck on hunting trips because

he could not hike or shoot, Tr. 215, he enjoyed daily visits with neighbors, Tr. 215, his mood and

attitude were generally "good", Tr. 216, and he had "no history of formal psychiatric diagnosis or

treatment", Tr. 214. Dowell also reported that he was having difficulty finding work of the type

he had performed in the past due to his age as well as his back and shoulder pain. Tr. 218.

Dowell further discussed his job search with Dr. Patrick,[5] and Dr. Patrick concluded that it was

"apparent" that Dowell had "additionally run into vocational barriers due to disciplinary problems

at some of his former jobs." Tr. 218. Finally, Dowell reported that he normally skips breakfast

and lunch, Tr. 215, and Dr. Patrick described Dowell as "thin", Tr. 216.

Dowell's Verbal IQ test score was 68, his Performance IQ test score was 70, and his Full

---

[5] Dr. Patrick did not document the details of this conversation.

Scale IQ test score was 66. Tr. 216. Dr. Patrick opined that these test scores underestimated Dowell's true intellectual capabilities. Tr. 216-17. Dr. Patrick observed that: Dowell's vocabulary was "more sophisticated than what might be predicted from his performance" on testing; Dowell's effort was "modest"; and Dowell seemed motivated to prove a mental limitation. Tr. 216. "While his overall scores are suggestive of borderline intellectual functioning, the . . . psychosocial history and description of social functioning is not consistent with these scores." Tr. 217. Dr. Patrick's overall clinical impression was chronic back and shoulder pain and alcohol dependence, with further need to rule out pain disorder, borderline intellectual functioning, and learning disorder. Tr. 219.

On November 1, 2002, Bill Hennings, Ph.D., reviewed Dowell's medical record and narrative and completed a Development Summary Worksheet. Tr. 177. He concluded that "[o]ther than academic difficulties there is no indication of deficits in adaptive functioning during [Dowell's] developmental period." Tr. 177. Dr. Hennings concurred with Dr. Patrick's opinion that, despite Dowell's poor effort during testing, Dowell's "intellectual level [was] likely to be below average[.]" Tr. 177. Dr. Hennings apparently misread Dr. Patrick's notes as diagnosing Dowell with borderline intellectual functioning, and concurred with that assessment. Tr. 177.

Social Security Administration ("Administration") employee Michael Summers reviewed Dowell's record and completed a Development Summary Worksheet on January 7, 2003. Tr. 176. Summers determined that Dowell was a 50 year-old applicant: who had "back pain and shoulder numbness" that "limited his lifting", Tr. 176; who could only "occasional[ly] climb, stoop, crouch, crawl and overhead reach due to [right] shoulder osteochondroma", Tr. 176; and who was "limited to simple 2-3 step instructions due to alcohol abuse and low IQ", Tr. 176.

Summers concluded that Dowell was "unable to return to past work but [was] able to do other work." Tr. 176.

Dowell's 2002 application for benefits was denied initially and then, on January 13, 2003, on reconsideration. *See Dowell, accessible on CM/ECF as* 6:05-CV-00180-AA, ECF No. 13-2, at 1. Dowell did not comply with the deadline for requesting an ALJ hearing.[6] *Id.*, ECF No. 13-4, 3-4; *id.*, ECF No. 14, 2–3. On January 15, 2003, Dowell re-filed for benefits with an alleged onset date of March 3, 2003. Tr. 90-91.[7]

On September 5, 2003, Dowell went to the emergency room and saw Steven Jackson, M.D., for Dowell's complaints of: "intermittent chest pain" over the prior couple of months, Tr. 221; "sharp left chest pain that does not radiate", Tr. 221; and "chronic right shoulder pain and lower back pain", Tr. 221. Dowell's motor exam was "symmetrical and strong", but his chest x-ray showed chronic obstructive pulmonary disease ("COPD"). Tr. 222. Dr. Jackson prescribed once-daily baby aspirin along with topical cream for a minor rash, and advised Dowell to stop smoking, decrease alcohol intake, and follow up with a primary care physician in one week. Tr. 222.

On an undated form, Dowell reported visiting the emergency room for chest pains on April 6, 2004. Tr. 191-92. There are no medical records of that visit present in the administrative record.

---

[6] As a result of Dowell's failure to exhaust administrative procedure, Dowell's subsequent appeal before a federal district court was dismissed on November 8, 2005, for lack of jurisdiction. *Id.*, ECF No. 14.

[7] As with Dowell's 2002 application for benefits, Dowell's 2003 application is neither part of the administrative record nor at issue in these proceedings.

Dowell's 2003 application for benefits was denied on September 30, 2004. Tr. 105-06, 301. Dowell requested Appeals Council review, but his request was denied.[8] Tr. 301.

On November 1, 2004, Dowell's wife Brenda submitted a Disability Report on Dowell's behalf, Tr. 140-46, reporting that Dowell had become depressed and had lost motivation to take care of his personal needs or housework. Tr. 144.

On October 20 and November 1, 2004, Dowell protectively applied for both Title II disability insurance benefits and Title XVI Social Security insurance benefits.[9] Tr. 92-95. Dowell initially alleged a disability onset date of April 16, 2002, Tr. 92, but later amended the onset date to January 1, 2005,[10] Tr. 302.

Dowell's wife Brenda completed another Disability Report on Dowell's behalf on November 16, 2004, alleging that Dowell's ability to work was limited by his inability to lift anything without experiencing pain, caused by Dowell's "[s]houlder/back [and] neck injury" with numbness in right leg, illiteracy, emphysema, and headaches. Tr. 98-99.

In two, largely identical Function Reports, one dated November 20, 2004, and the other dated November 21, 2004, Tr. 108-16, 125-32, Dowell's wife Brenda reported that Dowell: could only lift 5-10 pounds, Tr. 113, 130; had decreased ability to lift, squat, bend, stand, sit, and kneel,

---

[8] There is no administrative record indicating that Dowell requested an ALJ hearing after that denial. Plaintiff does not here seek judicial review of the September 30, 2004, denial of Dowell's 2003 application for benefits, and no party has offered any argument or evidence to suggest that the decision should be disturbed.

[9] Due to Dowell's illiteracy, either Administration personnel or Dowell's wife completed the applicable forms. Tr. 92-95, 97, 106-08, 116, 146.

[10] Dowell agreed to amend his disability onset date to January 1, 2005, at his October 15, 2007, ALJ hearing, after the ALJ noted that *res judicata* limited the scope of Dowell's benefit claims. Tr. 300-02.

Tr. 113; did not have decreased "reaching" capabilities, Tr. 113; was unable to work, wrestle with his boys, or work on cars due to his disability, Tr. 109; could not use a checkbook or make out money orders because he could not read or write, Tr. 111, 128; no longer went fishing or hunting because he could not afford the license and could not stand for long periods of time, Tr. 112, 129; could walk only "a block or so" before needing to rest for approximately ten minutes, Tr. 113, 130; and no longer got out much to socialize, Tr. 112-13. Brenda also reported that Dowell: was able to play solitaire, Tr. 108; cared for the family's pet iguana, Tr. 109, 215; had no problems with personal care, Tr. 109-10; did not need help or reminders to groom himself or to do housework, Tr. 110; could drive a car, Tr. 111; and could handle changes in routine "OK", Tr. 114.

Also on November 21, 2004, Brenda completed a Fatigue Questionnaire on Dowell's behalf, Tr. 133, reporting that Dowell: went on walks "occasionally", Tr. 134; could only walk "half a block" without resting, Tr. 134; could "[f]requently" reach forward or up, Tr. 135; and felt sad, depressed, and angry because he could not support his family, help pay bills, or buy food, Tr. 135. That same day, Brenda completed a Pain Questionnaire on Dowell's behalf, Tr. 137-39, reporting that Dowell had "aching" back and shoulder pain that could last hours, days, or even weeks if he "[made] the wrong move" or stood for too long, Tr. 137, and that Dowell "[n]ever" took walks, Tr. 138.

Dowell saw Michael Gillies, M.D., in an emergency room on January 17, 2005. Tr. 228. Dowell reported that he had slipped and fallen on ice two days prior, landed on his side, and had been experiencing increasing pain on the right side of his chest and rib area, with no other significant health problems. Tr. 228. An x-ray showed evidence of a left shoulder abnormality.

Tr. 229. Dr. Gillies diagnosed Dowell with chest contusion and chest wall strain, reactive airway disease, and tobaccoism. Tr. 229, 234. Dr. Gillies prescribed 600mg ibuprofen 4 times per day, 1-2 vicodin as necessary every 6 hours for pain at night, 1/2-1 flexeril 3 times per day, and 2-6 albuterol inhalers as needed for cough, wheezing, or shortness of breath. Tr. 229-30. Dr. Gillies instructed Dowell to follow up in the next couple of weeks, or sooner if problems developed. Tr. 230.

On April 14, 2005, Administration employee Michele Grindahl reviewed Dowell's record and decided that Dowell did not need a new psychiatric consultative examination. Tr. 171. Grindahl noted that although Dowell had reported feeling sad and angry, Dowell had not alleged depression, was not in treatment, had no significant psychiatric history, and had no cognitive or social problems. Tr. 171.

Donna Launey, M.D., interpreted Dowell's lumbar spine and right shoulder x-rays on May 4, 2005. Tr. 239. Dr. Launey's impression was that Dowell had "[m]ild degenerative disc change at L5-S1" of the lumbar area, and "mild degenerative changes in the AC joint" of the right shoulder. Tr. 239.

Also on May 4, 2005, Dowell saw Kim Webster, M.D., for Dowell's complaints of constant right shoulder pain without weakness and low back pain that had become gradually worse over the prior five years and that increased with activity and decreased with rest. Tr. 235. Dr. Webster documented Dowell's report that Dowell did no cooking or cleaning, spent his time sitting in the kitchen listening to the radio, and consumed 12-24 beers per day. Tr. 235-36. Dr. Webster described Dowell as an "articulate", "very thin male in no acute distress", who had "a very serious, grim affect." Tr. 236. Dr. Webster observed alcohol on Dowell's breath. Tr. 237.

13 - FINDINGS AND RECOMMENDATION

Dr. Webster determined that Dowell had "no pain [associated with] . . . percussion of the lumbar spine. . . or [with] rotation at the shoulders", "normal tone and strength in [his] . . . upper and lower extremities", and "normal range of motion" at his right shoulder. Tr. 237-38. Dr. Webster concluded that there was "no objective evidence that would limit [Dowell's] ability to stand, walk, sit, lift, or carry", and "no need for postural or manipulative restrictions." Tr. 238.

On May 16, 2005, Dr. Hennings assessed Dowell's mental residual functional capacity ("RFC") and evaluated Dowell's capabilities for the period between April 16, 2002, and April 14, 2005. Tr. 241. Dr. Hennings opined that Dowell had a moderately limited ability: to understand and remember very short and simple instructions; to carry out detailed instructions; to interact appropriately with the general public; and to set realistic goals or make independent plans. Tr. 241-42. Other than those limitations, Dr. Hennings opined that Dowell's abilities to understand and remember, to sustain concentration and persistence, to interact socially, and to adapt were not significantly limited. Tr. 241-42. Dr. Hennings further opined that Dowell was "capable of, but limited to, understanding, remembering, and carrying out simple job tasks due to his low IQ and his alcoholism" and should not interact with the public frequently. Tr. 243.

Dr. Hennings diagnosed Dowell with a 12.09 substance addiction disorder and also reconfirmed his earlier diagnosis of borderline intellectual functioning, categorized as a 12.02 organic mental disorder. Tr. 244-45. Dr. Hennings opined that Dowell had "no" episodes of decompensation, "mild" limitations in his daily living activities, and "moderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. Tr. 254. Dr. Hennings indicated that Dowell did not have any marked functional limitations as a result of Dowell's mental disorders. Tr. 254. Despite Dowell's low IQ scores, Dr. Hennings did not

believe Dowell qualified for the 12.05 mental retardation category in light of Dowell's "incomplete effort" on testing. Tr. 256. Dr. Hennings noted that Dowell's mental status had not, in the past, prevented Dowell from working or interfered with Dowell's independence. Tr. 256.

Dr. Hennings indicated that Dowell did not have a Listing 12.04 Affective Disorder, Tr. 247, 255. Dr. Hennings noted that Dowell alleged feeling sad, depressed, and angry because he could not help support his family, Tr. 256, but also noted that Dowell had no history of psychiatric treatment, Tr. 256.

Also on May 16, 2005, Martin Kehrli, M.D., reviewed the medical evidence and determined that Dowell had COPD, borderline intellectual functioning, and mild disc degeneration. Tr. 38, 40, 258. Dr. Kehrli further determined that Dowell was able to: occasionally lift 50 pounds and frequently lift 25 pounds, Tr. 259; stand, walk, or sit (with normal breaks) for about six hours in an eight-hour work day, Tr. 259. Dr. Kehrli indicated that Dowell had no manipulative limitations, but then contradicted himself by opining that Dowell's manipulative ability was limited to only "occasional overhead reach due to right shoulder osteochondroma." Tr. 261. Dr. Kehrli opined that Dowell's "allegations [were] only partially credible" in light of the discrepancy between Dowell's alleged limitations and reported activities, and physicians' "minimal findings of functional limitation" upon physical examination. Tr. 265. Dr. Kehrli concluded that Dowell was capable of medium work with limited exposure to fumes but with no other restrictions, and that Dowell was not disabled at any point from January 30, 2005, through the date of examination. Tr. 38, 40, 258, 265.

Dowell's 2004 applications for benefits were initially denied on May 16, 2005. Tr. 37-38, 61-70. The Administration determined that Dowell did not have significant loss of motion,

muscle weakness or nerve damage, could still perform certain types of work despite breathing problems, and was able to understand, remember, and carry out simple instruction. Tr. 60, 70. On the basis of Dowell's RFC, age, education, and past work, the Administration concluded that Dowell's conditions were not severe enough to keep him from working. Tr. 60, 70. Dowell's request for reconsideration was timely received. Tr. 55.

On June 23, 2005, Dowell's wife Brenda completed a new round of questionnaires on Dowell's behalf, again reporting on Dowell's level of fatigue, pain, and functioning. Tr. 147-69. Brenda did not report any changes in Dowell's symptoms, however, other than pain during reaching, Tr. 159, 167, and an inability to "reach (forward or up)" or bend, Tr. 149.

Administration employee Carol Rathkey reviewed Dowell's records and completed a Development Summary Worksheet on August 5, 2005. Tr. 172. In Rathkey's Mental Summary, she summarized Dowell's allegations regarding his mental limitations as "an inability to read/write." Tr. 172. Rathkey noted that it was difficult to give a true estimate of Dowell's mental limitations because of Dowell's questionable effort on mental testing, and because of the discrepancy between Dowell's performance on those tests and Dowell's reported activities. Tr. 172. Rathkey also noted that Dowell was independent, had maintained consistent employment in the past, and was not alleging any change in mental functioning over time. Tr. 172. Rathkey concluded that Dowell's mental functioning was not so severe that it would interfere with potential employment. Tr. 172. In Rathkey's Physical Summary, she summarized Dowell's allegations regarding his physical limitations as "shoulder, back and neck injury and emphysema[.]" Tr. 172. Rathkey noted that Dowell's x-rays showed mild degenerative changes of the lumbar spine and right shoulder AC joint, but there was no objective evidence that Dowell

16 - FINDINGS AND RECOMMENDATION

had "postural or manipulative restrictions" or limited ability "to stand/walk/sit/lift/carry[.]" Tr.

172. Rathkey concluded that Dowell had a medium RFC without postural, manipulative, visual

or communicative limitations, and that he should have limited environmental exposure to fumes,

odors, dusts, and gases due to his COPD. Tr. 172.

On August 10, 2005, Robert Henry, Ph.D., reviewed Dowell's medical record and

completed a Mental Summary. Tr. 266. Dr. Henry noted that Dowell's "questioned effort on

testing and discrepancies between reports and performance made it difficult to give a true

estimate of his limitations." Tr. 266. Dr. Henry concluded that "[l]imiting [Dowell] to simple

tasks and limited public contact remains appropriate." Tr. 266.

On August 12, 2005, Richard Alley, M.D., reviewed Dowell's medical record and

completed a Physical Summary. Tr. 267. Dr. Alley determined that Dowell's x-rays showed

mild degenerative changes in the lumbar spine and in the right shoulder AC joint. Tr. 267. Dr.

Alley concluded that that Dowell had "[m]edium RFC without postural, manipulative, visual or

communicative limitations, but [should have] limited exposure to fumes, odors, dusts and

gases[.]" Tr. 267.

On August 18, 2005, Dowell's 2004 applications were denied upon reconsideration. Tr.

49, 51-52, 54. Dowell timely appealed. Tr. 46, 184-90. The next procedural step in the

Administrative appeals process did not occur for over two years. Tr. 201-03. Dowell has

indicated that, during that time, he did not experience any relevant medical changes, Tr. 422-23,

and was not treated or examined by any physician, Tr. 303. Dowell turned 55 years old on

March 23, 2007. Tr. 33.

Dowell had a hearing on October 15, 2007, before ALJ Linda Haack. Tr. 298-337. At

17 - FINDINGS AND RECOMMENDATION

the hearing, Dowell reported that: the most he lifted as a warehouse scanner was one pound, Tr. 314-15, 329; when he had to move a case of something to scan it, he had to lift up to 50 pounds, Tr. 313, 316; the reason he couldn't go back to work was because of his back, Tr. 316; he could lift up to 50 pounds before his back went out, Tr. 317; and his back was worse than it used to be and kept getting worse, Tr. 318. When ALJ Haack asked Dowell, "Did anything happen . . . after you stopped working . . . to make you believe your back would keep you from going back to work?", Dowell responded, "No." Tr. 318.

Dowell also reported at his October, 2007, ALJ hearing that: he could not even walk through a grocery store with his wife anymore without running out of air, Tr. 320; he was depressed all the time, and couldn't find a job, Tr. 321; and he was unable to seek care due to limited financial resources, Tr. 298, 302-03. When ALJ Haack asked where Dowell got the money to pay for the 12-24 beers per day that he was drinking, Dowell's wife responded that "Friends usually buy him beer" and that Dowell gathered change. Tr. 324-25.

The Vocational Expert ("VE") determined that Dowell's prior employment experience included semi-skilled and medium work jobs. Tr. 330-31. ALJ Haack asked the VE to consider a 55 year-old individual who could read and write his name, add and subtract simple numbers, and lift 50 pounds, who was limited to simple, repetitive tasks and limited public contact, and who had environmental limitations regarding dust, fumes, gases, odors, and temperature extremes. Tr. 331-32. The VE determined that such an individual could not perform Dowell's past work, but could work as a sweeper or as a recycler/reclaimer. Tr. 332.

At the end of the October 15, 2007, ALJ hearing, Dowell's attorney asserted that the record was incomplete, and asked ALJ Haack to supplement the record with further medical

18 - FINDINGS AND RECOMMENDATION

consultations. Tr. 333-334. ALJ Haack granted that request. Tr. 334-37.

On December 1, 2007, Dowell saw internist John Ellison, M.D., for a consultative examination. Tr. 268-70. Dowell reported that he had developed neck pain sometime during the prior three or four months that radiated into his right shoulder and arm, and that he had such difficulty moving his right shoulder and arm that he could not dress or undress without his wife's assistance. Tr. 268. Dowell's weight had declined to 122 pounds, and Dr. Ellison described Dowell as "underweight, bearded, dirty, coughing", and as having a depressed affect. Tr. 269. Dr. Ellison opined that Dowell's history "was somewhat questionable." Tr. 268. "In general, examinations and x-rays have shown little evidence of disease or disorder except COPD." Tr. 268. Dr. Ellison diagnosed Dowell with: "[c]hronic low back pain"; "muscle spasm with flattening of lumbar lordosis and limited range of motion";"[m]oderate COPD secondary to smoking"; "[p]robable chronic alcoholism"; "[c]hronic depression"; acid reflux; and an "[a]pparently painful and frozen right shoulder," although Dr. Ellison "suspect[ed] magnification" in light of Dowell's "symmetrical musculature[.]" Tr. 270.

On December 4, 2007, Dr. Ellison assessed Dowell's physical "ability to do work-related activities on a regular and continuous basis[.]" Tr. 271-76. Dr. Ellison opined that Dowell could "never": lift or carry over 21 pounds, Tr. 271; reach overhead or "push/pull" with his right hand, Tr. 273; climb ladders or scaffolds, Tr. 274; or stoop, kneel, crouch, or crawl, Tr. 274. Dr Ellison also opined that Dowell was able to: frequently lift or carry up to 10 pounds and occasionally lift or carry 11-20 pounds, Tr. 271; sit for a total of 8 hours, stand for 1 hour, and walk for one hour during an 8-hour workday, Tr. 272; and to "occasionally" reach in directions with both hands (other than the overhead reach restriction on his right side), Tr. 273.

Also on December 4, 2007, psychologist Karen Bates-Smith, Ph.D., assessed Dowell's mental abilities. Tr. 207, 279-86. Dowell's wife reported that Dowell had "been sad and depressed since their son died a year ago in Iraq," Tr. 281, with symptoms of appetite loss, poor sleep, poor energy level, restlessness, and feelings of worthlessness and hopelessness, Tr. 283-84. Dr. Bates-Smith observed that Dowell had a flat affect, a depressed mood, and soft, monotonal speech. Tr. 283, 285. Dr. Bates-Smith diagnosed Dowell with chronic depression that "has been going on longer" than one year, with "[s]adness and depression . . . first noted" by physicians on May 16, 2005,[11] and possibly extending back four years to when Dowell stopped fishing. Tr. 279-80, 83-84.

Dr. Bates-Smith also diagnosed Dowell with alcohol abuse, pain disorder associated with both psychological and medical factors, borderline intellectual functioning, reading disorder, back pain, and right shoulder pain. Tr. 283. Dr. Bates-Smith concurred with Dr. Patrick that Dowell was not mentally retarded. Tr. 284. Unlike previous doctors, Dr. Bates-Smith believed Dowell was "a good historian" who put forth "good effort on mental status tasks[.]" Tr. 279. Dr. Bates-Smith hypothesized that embarrassment might have made Dowell's effort appear limited. Tr. 284. Dr. Bates-Smith opined that Dowell's borderline intellectual function and reading disorder were static problems, but that Dowell's adaptive functioning had declined over time due to depression and pain, reducing his ability to carry out a normal work week. Tr. 285-86, 288. Dr. Bates-Smith did not believe Dowell's alcohol use contributed to his limitations. Tr. 288.

---

[11] Dr. Bates-Smith wrote that Dowell's sadness and depression were first noted on May 16, 2006, Tr. 283, but it appears from Dr. Bates-Smith's review of Dowell's medical history that she made a typo and was actually referring to Dowell's May 16, 2005, visit with Dr. Hennings, Tr. 279-80.

ALJ Haack entered the new medical evidence from Drs. Ellison and Bates-Smith into the record, and issued a partially favorable decision on April 30, 2008. Tr. 11-25, 207-08. ALJ Haack found that Dowell had the RFC to perform medium work prior to December 01, 2007.[12] Tr. 19. ALJ Haack further found that, after December 1, 2007, Dowell did not have transferable job skills, Tr. 23, and had the RFC to perform only sedentary work, Tr. 22. Considering Dowell's age, education, work experience, and RFC, and using the Medical-Vocational Rules as a framework, ALJ Haack determined that Dowell was not disabled prior to December 1, 2007, but became disabled on that date. Tr. 24.

Dowell requested an Appeals Council review of ALJ Haack's decision regarding Dowell's disability onset date. Tr. 8-10, 296-97, 396. The Appeals Council denied the request for administrative review on December 11, 2009. Tr. 4. In consequence, ALJ Haack's decision of April 30, 2008, became the Agency's final order for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 421(d), 1383(c)(3); 20 C.F.R. §§ 404.900(a)(5), 404.981, 416.1400(a)(5), 416.1481, 422.210(a); *see also, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On appeal, upon stipulation of the parties, a federal district court found that the VE's job recommendations each entailed hazards contradicting Dowell's environmental restrictions and remanded on December 2, 2010, to obtain further VE testimony. Tr. 362-64. On February 29, 2011, the Appeals Council affirmed ALJ Haack's finding that Dowell was disabled beginning December 1, 2007, and vacated ALJ Haack's finding that Dowell was not disabled prior to that date. Tr. 352-55.

---

[12] Dowell's last insured date for disability benefits was December 31, 2007. Tr. 75, 197, 342.

On August 25, 2011, Dowell had another ALJ hearing, this time before ALJ Eleanor

Laws, to determine at what point between January 1, 2005, and December 1, 2007, Dowell

became disabled. Tr. 417, 420. On September 15, 2011, ALJ Laws issued a partially favorable

decision finding Dowell disabled as of March 23, 2007. Tr. 341-51. Dowell did not file

exceptions and the Appeals Council did not review the case *sua sponte*, so the September 15,

2011, ALJ Laws's determination became the final decision of the Commissioner sixty days

thereafter.[13] *See* 20 C.F.R. §§ 404.984(d), 416.1484(d). This action followed.

### SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, ALJ Laws found in her

September 15, 2011, decision that Dowell did not engage in substantial gainful activity at any

time following his alleged disability onset date (as amended) of January 1, 2005. Tr. 342, 344.

She therefore proceeded to the second step of the analysis.

At the second step, ALJ Laws found that Dowell's medical impairments of chronic pain

in his back and right shoulder secondary to mild degenerative changes, chronic obstructive

pulmonary disease, and borderline intellectual functioning were "severe" for purposes of the Act.

Tr. 344-45. ALJ Laws then proceeded to the third step of the analysis.

At the third step, ALJ Laws found that, since Dowell's alleged disability onset date, none

---

[13] Notice of ALJ Laws's decision directed Dowell to file a timely appeal with the Appeals
Council. Tr. 338. The Notice also warned that, without an Appeals Council review (either on
appeal or by its own accord), Dowell would "not have the right to Federal court review." Tr.
339. There is no evidence in the administrative record that Dowell complied with that mandate,
nor does the Plaintiff's Brief (#13) assert that Dowell appealed ALJ Laws's decision to the
Appeals Council. However, even without a request for Appeals Council review, an ALJ decision
becomes the final decision of the Commissioner after Appeals Council review and remand if no
exceptions are filed and the Appeals Council does not assume jurisdiction. *See* 20 C.F.R. §§
404.984(d), 416.1484(d).

of Dowell's impairments were the equivalent of any of the impairments enumerated in 20 C.F.R.

§ 404, Subpt P, App. 1. Tr. 345. ALJ Laws determined that Dowell had borderline intellectual

functioning with mental limitations of:

> mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. Since January 1, 2005, the claimant's activities of daily living have included watching television, and completing household chores such as cooking, cleaning, washing dishes and laundry. He has been able to drive an automobile and performed household errands. His hobbies have included listening to the radio and playing card games. He has been functionally independent with regard to his personal hygiene and financial affairs. He has a couple of friends and he gets along pretty well with family and friends. His concentration, persistence and pace [have] been fair to good.

Tr. 345. ALJ Laws reviewed Dowell's IQ scores and Dr. Patrick's mental assessment of Dowell,

and determined that Dowell did "not have a valid verbal, performance, or full IQ of 60-70" and

that his mental functioning therefore did not satisfy Listing 12.05(C). Tr. 345.

ALJ Laws then conducted an assessment of Dowell's RFC. Specifically, ALJ Laws found

that during the relevant adjudicatory period:

> [Dowell had] the residual functional capacity to perform less than the full range of medium work . . . . He was able to read and write his name. He was able to add and subtract simple numbers. He was able to sit 2 hours at a time for a total of 8 hours during a full[-]time 8-hour workday with normal breaks. He was able to stand and/or walk 2 hours at a time for a total of 8 hours during a full[-]time 8-hour workday with normal breaks. He was able to lift 50 pounds. He should [have] avoid[ed] even moderate exposure to dust, gases, fumes, odors, and extremes of heat and cold. He was able to perform simple, repetitive tasks with limited public contact.

Tr. 345-46 (January 1, 2005, through March 23, 2007), 348 (same findings for March 23, 2007,

through December 1, 2007). In reaching these conclusions, ALJ Laws purported to have

considered all of the objective medical evidence in the record. Tr. 346.

ALJ Laws summarized Dowell's allegations as: inability to work due to a shoulder, back,

23 - FINDINGS AND RECOMMENDATION

and neck injury; emphysema; headaches; chronic pain in his back and right shoulder; functional illiteracy; limited mobility; difficulties with lifting and/or carrying weight, walking, standing, sitting, reaching, lifting, and breathing; limited concentration; and difficulties completing tasks and interacting with others. Tr. 346. ALJ Laws determined that Dowell's medically determinable impairments could reasonably be expected to cause his alleged symptoms. Tr. 346. However, ALJ Laws found that Dowell's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible . . . to the extent they are inconsistent with the residual functional capacity assessment." Tr. 346.

ALJ Laws determined that Dowell had "mild degenerative changes in the lumbar spine and the AC joint of the right shoulder" and COPD, with treatment involving medications such as vicodin, flexeril, albuterol, ibuprofen, and advil. Tr. 346-37. ALJ Laws determined that Dowell had "received only conservative and routine treatment" for his "numerous subjective complaints", suggesting Dowell's impairments did "not result in significant functional limitation" that precluded basic work activity. Tr. 347. Due to Dowell's limited finances, however, ALJ Laws considered Dowell's lack of treatment as one factor rather than as a determinative factor. Tr. 347.

ALJ Laws gave great weight to Dr. Patrick's October 2002, intellectual assessment of Dowell. Tr. 347. ALJ Laws noted Dr. Patrick's opinion that although Dowell's IQ scores were suggestive of borderline intellectual functioning, Dowell's effort on testing was questionable and his psychosocial history and description of social functioning were not consistent with those scores. Tr. 348. "Dr. Patrick concluded that although the claimant may have intellectual and achievement deficits, it was difficult to ascertain from the evaluation . . . the true extent of those deficits[.]" Tr. 348. ALJ Laws determined that Dr. Patrick's "assessment of the claimant's

impairments and level of functioning is consistent with the evidence of record." Tr. 348.

ALJ Laws determined that Dowell's January, 2002, emergency room report did not suggest anything more than an acute episode of chest pain and a respiratory disorder. Tr. 347.

ALJ Laws gave some weight to Dr. Webster's May, 2005, consultative physical evaluation, wherein Dr. Webster diagnosed Dowell "with pain in his lower back with normal neuromuscular exam, right shoulder pain with normal range of motion and a normal examination, chronic obstructive pulmonary disease, and probable alcoholism." Tr. 347. ALJ Laws also noted Dr. Webster's conclusion that there was no objective evidence indicating Dowell had exertional limitations. Tr. 347. ALJ Laws nevertheless determined that Dowell had some exertional limitations because of the mild degeneration at Dowell's lumbar region and right shoulder. Tr. 347.

ALJ Laws gave significant weight to Dr. Kehrli's May 2005, consultative opinion that Dowell had the capacity to perform medium exertion work with environmental limitations. Tr. 347. ALJ Laws also gave significant weight to Dr. Alley's August, 2005, consultative opinion, wherein Dr. Alley concurred with Dr. Kehrli that Dowell had the capacity to perform medium exertion work with environmental limitations. Tr. 347.

ALJ Laws gave significant weight to Dr. Hennings's May 2005,[14] opinion that Dowell "had the capacity to understand, remember and carry out simple job tasks and he should not interact with the public frequently due to low IQ and alcoholism." Tr. 348. ALJ Laws also gave significant weight to Dr. Henry's August 2005, opinion that Dowell could perform simple tasks,

---

[14] ALJ Laws described Dr. Hennings's review as occurring in May 2006, Tr. 348, but in context and in light of the medical record, that appears to have been a typo.

25 - FINDINGS AND RECOMMENDATION

but should have limited public contact. Tr. 348.

At the fourth step of the five-step process, ALJ Laws found that, in light of Dowell's RFC, Dowell was unable to perform his past relevant work. Tr.349.

At the fifth step, ALJ Laws noted that on March 23, 2007, Dowell's age category went from "an individual closely approaching advanced age" to "an individual of advanced age" under 20 C.F.R. §§ 404.1563, 416.963. Tr. 349.

ALJ Laws first considered whether Dowell was disabled before March 23, 2007. Using the Medical-Vocational Rules framework, ALJ Laws determined that the transferability of Dowell's job skills was not material before that date. Tr. 349. Considering Dowell's age, education, work experience, and RFC prior to March 23, 2007, ALJ Laws determined that Dowell could have performed jobs existing in significant numbers in the national and local economy. Tr. 349-50. Relying in part on objective VE testimony, ALJ Laws cited the occupations of hand packager (833,800 positions in the national economy and 8,890 positions in Oregon) and nut and bolt assembler (261,600 positions in the national economy and 5,260 positions in Oregon) as examples of light exertion, unskilled work that Dowell could perform prior to March 23, 2007, despite his limitations. Tr. 349-50. ALJ Laws therefore concluded that Dowell was not disabled as defined by the Act at any time between January 1, 2005, and March 23, 2007. Tr. 350.

ALJ Laws next considered whether Dowell was disabled after March 23, 2007. Using the Medical-Vocational Rules framework, ALJ Laws determined that the transferability of Dowell's job skills was material because of the change in Dowell's age category on that date. Tr. 349-50. ALJ Laws further determined that Dowell has not been able to transfer his job skills to other

occupations since March 23, 2007. Tr. 349-50. Applying Medical-Vocational Rule 202.02, ALJ

Laws determined that Dowell became "disabled" on March 23, 2007. Tr. 350.

ANALYSIS

As detailed above, Dowell did not see any physicians between May 16, 2005, and

December 1, 2007. ALJ Laws assessed Dowell's RFC from January 1, 2005, through December

1, 2007, and concluded it did not change during that time. On December 1, 2007, Dr. Ellison

diagnosed Dowell with a variety of additional physical and mental limitations. On December 4,

2007, Dr. Bates-Smith concurred with Dr. Ellison's diagnosis of depression, and expanded on

Dowell's mental limitations. ALJ Laws did not discuss any evidence dated later than Dr. Henry's

August 10, 2005, reviewing opinion. ALJ Laws failed to discuss the December 1, 2007, and

December 4, 2007, examining medical opinions of Drs. Ellison and Bates-Smith, respectively.

Dowell challenges ALJ Laws's determination that Dowell was not disabled between

January 1, 2005, and March 23, 2007. Plaintiff's Brief, #13, at 6, 12. Dowell contends that: at

step two, ALJ Laws failed to include depression among Dowell's severe impairments; at step

three, ALJ Laws erroneously concluded that Dowell's combined impairments did not meet or

equal the listed impairment of "mental retardation"; also at step three, ALJ Laws improperly

determined Dowell's RFC; and at step five, ALJ Laws failed to show that Dowell could perform

jobs that exist in significant numbers in the national economy. *Id.*, at 8-9, 12-16.

## I.    Severe Impairments

Dowell contends ALJ Laws erred at step two by failing to identify and consider major

depressive disorder and depression among Dowell's severe impairments prior to March 23, 2007.

*Id.*, at 18-20. As previously noted, at step two an ALJ must determine whether a claimant has

any combination of impairments that significantly limit his or her ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does not meet this *de minimis* severity requirement, the ALJ must find him or her not disabled and need not continue beyond step two. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Here, ALJ Laws resolved step two in Dowell's favor, finding Dowell's ability to work significantly limited by his "severe" impairments. Tr. 344-45. Any error in identifying and evaluating Dowell's specific impairments at step two was harmless at that juncture. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (an ALJ's error in omitting a severe impairment is harmless at step two where the ALJ nevertheless resolves step two in the claimant's favor).

**II.    Step Three: Listing 12.05(C)**

Dowell contends that ALJ Laws erroneously concluded that Dowell did not have "[a] valid verbal, performance, or full scale IQ of 60 through 70" as required in order to meet "[t]he required level of severity for [mental retardation]" under Listing 12.05(C). Plaintiff's Brief, #13, at 16.

Specifically, Dowell assigns error to ALJ Laws's failure to evaluate Dr. Bates-Smith's opinions regarding Dowell's mental functioning, as follows: "[i]t could be that [Dowell's] embarrassment over not being able to read contributed to the appearance of limited effort . . . for Dr. Patrick in 2002"; Dowell was a credible reporter"; "he gave good effort on mental status tasks"; Dowell provided answers "consistent with IQ testing done in 2002"; Dowell's "[IQ] test findings . . . were probably . . . valid"; Dowell was not "mentally retarded" and instead "function[ed] in the [b]orderline [intellectual] range" because his "adaptive functioning in 2002 was fine"; and Dowell's "adaptive functioning . . . [has] declined since [2002] . . . due to

depression and pain." *Id.*, at 16-18, *quoting* Tr. 284-86.

"An ALJ is not required to discuss all the evidence presented in a case, but must explain why he [or she] chooses to discount 'significant probative evidence.'" *Houghton v. Comm'r Soc. Sec. Admin.*, 493 F. App'x 843, 845 (9th Cir. 2012), *quoting Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

ALJ Laws did not err by failing to discuss Dr. Bates-Smith's opinions regarding whether Dowell's mental limitations met the diagnostic criteria for Listing 12.05(C), because ALJ Laws did not discount them.  Dr. Bates-Smith opined that Dowell was "not mentally retarded," Tr. 284, and that Dowell's adaptive functioning began to decline in 2002, Tr. 286, when Dowell was approximately 50 years old, Tr. 209.  Pursuant to Listing 12.05, "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  Even if ALJ Laws had fully credited Dr. Bates-Smith's opinions, Dowell's mental impairment did not satisfy the Listing 12.05 definition of "mental retardation."  ALJ Laws therefore did not discount Dr. Bates-Smith's opinions regarding Dowell's mental status by determining that Dowell did not meet the requirements of Listing 12.05(C), and ALJ Laws was not required to discuss Dr. Bates-Smith's opinions in that context.

## III.    Step Three: Residual Functional Capacity

Dowell contends that ALJ Laws improperly determined Dowell's RFC because ALJ Laws discounted without explanation significant and probative medical evidence that Dowell's RFC included additional, disabling limitations prior to March 23, 2007.  Plaintiff's Brief, #13, at 9-16, 18-20.  As previously noted, ALJ Laws determined Dowell's RFC from January 1, 2005, through

December 1, 2007, without discussing either Dowell's allegations or medical evidence regarding the period from August 10, 2005, through December 1, 2007. There are significant discrepancies between ALJ Laws's determination of Dowell's limitations between January 1, 2005 through December 1, 2007, and Dowell's limitations during that same time period according to the December 1, 2007, and December 4, 2007, examining physicians' opinions of Drs. Ellison and Bates-Smith, respectively.

ALJ Laws determined that, between January 1, 2005, through December 1, 2007, Dowell had the physical RFC to stand and/or walk for 2 hours at a time for a total of 8 hours per day, and to lift 50 pounds. Tr. 345-48. On December 1, 2007, Dr. Ellison's examining opinion was that Dowell could: stand for only 20 minutes at a time for a total of 1 hour per day; walk for only 10 minutes at a time for a total of 1 hour per day; never lift 21-50 pounds; only occasionally lift 11-20 pounds; and could frequently lift up to 10 pounds. Tr. 271-72. Dr. Ellison further opined that Dowell could: "never" reach overhead or push/pull with his right hand, Tr. 273; only "occasionally" reach in other directions, handle, finger, and feel with his right hand, Tr. 273; "never" climb ladders or scaffold, stoop, kneel, crouch, or crawl, Tr. 274; and only "occasionally" climb stairs and ramps or balance, Tr. 274. ALJ Laws neither provided any reasons to disregard that uncontroverted examining physician's opinion, nor determined when those limitations began to affect Dowell's RFC.

ALJ Laws did not discuss whether Dowell's mental RFC between January 1, 2005, through December 1, 2007, was affected by his depression. On December 1, 2007, Dr. Ellison diagnosed Dowell with chronic depression. Tr. 268, 270. On December 4, 2007, Dr. Bates-Smith also diagnosed Dowell with chronic depression. Tr. 283-86. Dr. Bates-Smith opined that

30 - FINDINGS AND RECOMMENDATION

Dowell's depression significantly limited his activities and adaptive functioning, Tr. 284-86 and that the medical record suggested Dowell's depression was first noted by a physician on May 16, 2005, Tr. 280, 283. Dr. Bates-Smith opined that Dowell's functional limitations included some restrictions in activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, pace, or persistence. Tr. 284-85. Dr. Bates-Smith did not indicate the severity of those functional limitations, however, other than to say that Dowell's concentration was "fair[.]" Tr. 285.

ALJ Laws could not reject Dr. Ellison's and Dr. Bates-Smith's opinions solely because they examined Dowell after March 23, 2007, the date ALJ Laws determined Dowell was disabled. "The significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis." *Morgan v. Sullivan*, 945 F.2d 1079, 1081 (9th Cir. 1991). "[W]hen the [medical] evidence regarding the onset date of [a claimant's] mental impairment is ambiguous," an ALJ must use the assistance of a medical expert in order to make an "informed" and "reasonable" inference regarding the onset date. *Id.*, at 1082-83. Although Dowell's depression may not meet the 12.04 Listing criteria for an affective disorder, an ALJ "is required to consider all of the limitations imposed by the claimant's impairments, even those that are not severe." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). "[E]ssentially the same impairment-related medical and nonmedical information is considered to determine whether the mental disorder . . . diminishes the individual's RFC." SSR 85-16, 1985 WL 56855, *1-*3.

The Commissioner contends that ALJ Laws did not err by ignoring the December 2007, consultative examinations. Defendant's Brief, #17, at 10-11, 13-14. Preprinted language on the

31 - FINDINGS AND RECOMMENDATION

medical forms stated: "The limitations above are assumed to be your opinion regarding current limitations.  However, if you have sufficient information to form an opinion within a reasonable degree of medical or psychological probability as to past limitations, on what date were the limitations you found above first present?"  Tr. 276, 288.  Both Dr. Ellison and Dr. Bates-Smith "left a blank space instead of entering an opinion."  Defendant's Brief, #17, at 11. The Commissioner argues that, in doing so, the physicians "declined to offer an opinion about [Dowell's] limitations prior to December [of] 2007."  Defendant's Brief, #17, at 11; Tr. 276, 288.

The Commissioner's characterization of Dr. Ellison's and Dr. Bates-Smith's December 2007 examining opinions is unpersuasive.  First, even if Dr. Ellison's December 1, 2007, examining opinion was strictly limited to Dowell's current physical limitations, ALJ Laws determined Dowell's RFC up to, and including, that date.  Dr. Ellison's examining medical opinion regarding Dowell's limitations on December 1, 2007, were uncontradicted.  Second, Dr. Bates-Smith opined on December 4, 2007, that the medical record suggested Dowell's depression began prior to May 16, 2005.  ALJ Laws implicitly rejected Dr. Bates-Smith's uncontradicted opinion by failing to consider whether Dowell's mental RFC between January 1, 2005, and December 1, 2007, was affected by depression.  ALJ Laws therefore implicitly rejected uncontradicted examining medical opinions regarding Dowell's limitations, without explanation.

An ALJ "may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing reasons.'"  *Carmickle*, 533 F.3d at 1164, *citing Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).  ALJ Laws committed reversible error by failing to provide legally sufficient reasons for implicitly rejecting Dr. Ellison's and Dr. Bates-Smith's conclusions and diagnoses.

IV.    **Existence of Jobs That Dowell Could Perform in the National Economy**

Dowell contends that ALJ Laws failed to fulfill her burden of demonstrating that, prior to March 23, 2007, Dowell could perform jobs that exist in the national economy.  Plaintiff's Brief, #13, at 8.

"Hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant, including, for example, pain and an inability to lift certain weights." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (emphasis in original) (citation omitted).  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value." *Id.* (citations omitted).

Here, ALJ Laws's hypothetical questions were legally deficient because the ALJ did not provide legally sufficient reasons for her decision not to incorporate the physical and mental limitations assessed by Drs. Ellison and Bates-Smith.  ALJ Laws did not meet her burden at step five, and her decision should be remanded for further proceedings consistent with this decision.

Even if ALJ Laws had accurately described Dowell's RFC, there is a discrepancy between ALJ Laws's description of Dowell's functional illiteracy and the Dictionary of Occupational Titles ("DOT") descriptions of the VE's example occupations.  An ALJ must "determine whether the [vocational] expert's testimony deviates from the Dictionary of Occupational Titles and whether there is a reasonable explanation for any deviation." *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007), *citing* SSR 00-4p, 2000 WL 1898704, *2 ("Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE . . . evidence and the

DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.").

Dowell argues that his inability to read or follow written instructions conflicted with the DOT occupational information. Plaintiff's Brief, #13, 13-14. A nut-and-bolt assembler "[w]eighs or counts . . . nuts and bolts, and records [the] number of units on [a] production form." DOT Code 929.587-010. A nut-and-bolt assembler must have "L1" (level one) language development skills, DOT Code 929.587-010, with the ability to: read "2,500 (two- or three-syllable) words"; "[c]ompare similarities and differences between words and between series of numbers"; and to write "simple sentences[.]" DOT, Appendix C, III. An inspector and hand packager "[p]acks inspected product[s] in cartons according to customer specifications, and carries cartons to storage area" and must have "L2" language development skills. DOT Code 559.687-074. Level two language development skills include the ability to: read "5,000-6,000 words"; "[r]ead adventure stories and comic books"; use the dictionary; "[r]ead instructions for assembling model cars and airplanes"; and "[w]rite compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs." DOT, Appendix C, III.

ALJ Laws determined that Dowell "was able to read and write his name[.]" By implication, Dowell was *not* able to read and write other words, and Dowell did not have the language development skills required to perform work as either a nut-and-bolt assembler or an inspector and hand packager. ALJ Laws erred by failing to "elicit a reasonable explanation" for this "apparent unresolved conflict between VE . . . evidence and the DOT[.]" SSR 00-4p, 2000 WL 1898704, *2. This provides further support for the conclusion that ALJ Laws did not meet

34 - FINDINGS AND RECOMMENDATION

her burden at step five.

## CONCLUSION

For the reasons set forth above, I recommend that this action be REMANDED to the Commissioner for further administrative proceedings consistent with this opinion.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 14th day of August, 2013.

Honorable Paul Papak
United States Magistrate Judge

35 - FINDINGS AND RECOMMENDATION